May it please the Court, Dale Seidman for the Navajo Nation, and before I begin I just wanted to take a moment to say that there may be one ground, one common ground we have and that at least we can take a breather, this isn't a patent case, so this is something that at least... It's a land patent case. What's that? It's a land patent case. You know I knew one of you would say that, it is somewhat of a land patent case. Anyway, we're here on appeal, basically there was one issue we were appealing which was the trial court's decision granting a motion for a summary judgment that the Navajo Nation did not have a property interest to bring a Fifth Amendment takings claim. Well I'm not sure that the Court of Federal Claims was saying that there's no property interest. I think what the Court of Federal Claims was saying is okay, we've got to construe this 1934 statute, the question is what did it convey, and it didn't convey immediate possessory interests until the dispute between the Navajo and the Hopis was worked out. Well, with all due respect, Your Honor, I don't think that's what the claims court said, but if it did, it would have been wrong because the 34 Act did not grant possessory interests, if you would. The 34 Act described a boundary, it recognized the interests of those Indians already on the land, and what the 34 Act did, which was litigated, frankly, in both the District Court of Arizona and the Ninth Circuit in Secoptowa, as the Court said, the 34 Act gave the Indian tribes that were on the land vested rights to the land, and used the term vested rights as of 1934, so that the subsequent litigation, let's move ahead to the 1974 Settlement Act that allowed the tribes to sue each other to quiet title, which I call, really frankly, basically authorizing an adverse possession case, if you will, kind of almost like a common law adverse possession case. Don't you agree that the 34 Act contemplated that the respective property rights of the Navajo and the Hopi had to be sorted out by some future mechanism? I don't, Your Honor. You don't. Why not? Because it wasn't sorting out any property rights. That was the whole key of, again, the 34 Act, as well as what was already held in the Ninth Circuit and denied at the U.S. Supreme Court. The 34 Act didn't sort out, it wasn't asking anyone to litigate what type of property rights or who, you know, how deep these property rights went. All the 34 Act did was recognize Indian title, complete vested property rights, 100% Indian title, and then the question became, later on, okay, what area? That's all it was. It was a geographic issue as to what area. That's kind of where we get off base, I think. The 1930... So you agreed, at least, that the question of which area belonged to the Navajo and which area belonged to the Hopi had yet to be determined. They didn't purport to determine that in the 34 Act, right? I certainly agree with that. Right? I certainly do. And that there would have to be some mechanism to sort that out, right? I also agree with that, Your Honor. So why isn't it appropriate to construe the 34 Act as not giving either the Navajo or the Hopi rights to a particular property to exclude other people from it until that question was sorted out? Because the rights vested in 34 by its own terms and by subsequent decisions by the courts. In other words, this wasn't... This is what I'm trying to get. This wasn't a type of case where there was litigation for the next 70 years, and at the end of that litigation, those rights sprung up. So at the end of litigation between the Hopi and the Navajo in 2006, rights weren't created in 2006. This is the fundamental difference in the property law that I'm trying to get across. The property rights were created in 1934. The property rights were created in 1934, unchanged almost in the last century, unchanged. The 74 Settlement Act didn't change those rights. The 1980 amendments didn't change those rights. The 1934 Navajo Indian Reservation Act has never been amended. It has never been changed. And that created the rights. So I mean, it's an easy way to try to get around... I mean, it was a thorny problem, admittedly, as to finally determining what small area the Hopi lived on, but this kind of gets to a lot of the facts we put forth before the... The Hopi claimed the whole Bennett-Freeze area, right? The Hopi claimed more than the whole Bennett-Freeze area, I believe, Your Honor, to be honest with you. But here's the problem, here's the problem, and we put all those facts before the claims court. Back when the 1934 Act was established, and shortly thereafter, there was, I mean, I hate to use the word plethora, but there was a plethora of government studies. This isn't something that people and the government didn't know about. Interior, the Department of Interior was on this issue about where the Hopis lived. And I will submit to you, if you actually look at the record and look at these studies, it has never been in dispute. That's the sad irony of this case and the torture history of this case. There was, gosh, I don't know, five, six, seven studies between roughly 1930 and 1937, all of which... And I can tell you, these weren't just people sitting at their desk in D.C., this wasn't just a courtroom, the interior was on the ground. These were BIA people on the ground, geologists, and I guess the term, I don't know if they were environmentalists back then, but they were grazing experts. These were substantial studies submitted to Interior, a whole slew of them. Every single... And they were trying to determine, okay, these were the issues in those studies. Where did the Hopis live within the 1934 reservation? What area did they use? What area did they graze? Those were the issues. Those issues were largely not contested because of this. And again, the geography is important here. This area does not concern the Hopi Reservation. The Hopis, and even the United States admits this, live basically, not basically, the Hopis live on mesas. That's where they live. The Hopi Reservation was carved out and involved in the 1882 reservation, not part of this case. That's where the Hopis live. Outside of the 1882 reservation, within the 1934 Navajo Reservation, there was a pocket of Hopi, and that was it. And they lived on a little mesa in the village of Mowakopi. There were 400 Hopis. That was known. Well, that's what you say, but that's not what the Hopis said. I agree. But this is my point. The United... Agree. Let me go back to what the Hopis were saying, your honor, if I might. First of all, I want to say what the United States knew. The United States studied it. They knew, and the Navajos have always agreed, Hopis lived in the village, 22,000 acres. That has relatively never been in dispute, ever, from 1934 on. Okay, so what's been in dispute? How did the Hopis graze outside of that? There was a little bit of dispute on that, not that much. And that dispute covered roughly 200,000 acres. That sounds like a lot, but in the context of a million and a half acres of the Bennett Freeze, it was not that much. And not only that, the 200,000 acres, if we looked at a map, was all concentrated right around the village of Mowakopi. It was all south of what would be in Arizona, I think it's Highway US-160. The vast area of the Bennett Freeze, there weren't any Hopis grazing anywhere. It sounds to me as though what you're saying is that the United States should have provided a mechanism for resolving these disputes faster. There's no question. It was outrageous, frankly, that it didn't. That's one of the problems in our take. That's one of the issues we're saying in our takings case is that if we were to get to prove it, or get to present evidence of it, the geographical extent of the area was, frankly, ridiculous. The temporal extent of it was crazy because we couldn't get it resolved. But I do want to go to this. So we have the United States has just a zillion studies, all of which very narrowly show the area of not just Hopi living, but Hopi use. And you say, well, but the Hopis didn't do that. It's true, the Hopis didn't. But that was largely resolved, not completely, but this is why the dates are important. In 1978, and this gets to Secaptua, in 1978, the Hopis and Secaptua v. McDonald and the Navajo litigated the issue as to what the 34 language meant. What did it do? Because the Hopis, the reason, if you actually read the case, and then the Ninth Circuit's interpretation. So, counsel, when is it that you think a compensable, unencumbered property right was conveyed? 1934, Your Honor. But you already acknowledged that the 1934 act didn't make clear where the boundaries were and there was a dispute amongst the various Indians. Sure, but if I'm not, Your Honor, I consider that no more of a common law dispute. You have a home, the two of you, justices have all, judges have all homes next to each other. You may have a dispute, typical boundary dispute. You have a deed, you have a deed, maybe there's an adverse possession claim between the two of you. Okay? God forbid it takes seven years to resolve that in court. But let's assume it takes whatever time it takes. At the end of that time period, when that dispute is resolved, whether someone has the possession or not, the rights got established back when the deeds were made. They didn't get established anew at the end of the litigation. But however, if I bought property or obtained property subject to an ongoing dispute, wouldn't that be a different situation? If I obtained and bought the house next to my colleagues knowing that he was asserting a right of ownership over part of it, wouldn't I then have an encumbered property right, at least until such time as the resolution occurs, rather than an unencumbered right? Fair point, Your Honor. That's why I get back to Socoptoa. This was a point I was trying to make, was this. Well, but that's the Ninth Circuit case, right? But that determined... That's the Ninth Circuit. This is not the Ninth Circuit. But that determined the rights because... That's a case. Those judges made a decision in that case. That does not bind us. I understand it doesn't bind you, but I understand. But what happened there was... This is what was encumbered as of 1934. This is the point I'm trying to get to across. The U.S., the Navajos, let's leave the Hopis aside just for the moment, knew where... It was easy to figure out, frankly, where people lived. What happened in Socoptoa... 1934 doesn't grant the Navajos and the Hopis clearly the rights to where they live. It's much more ambiguous than that. It may already be located thereon. And that's, of course, what later opened up the whole possession or grazing or going to a sacred site for a religious pilgrimage once a year. It opened up a whole variety of disputes. That language lacked clarity to define boundaries at the time of the quest to the Indians as between them. I agree. It was given clarity, however, by the District Court in 1978 and by the 9th Circuit in 1980 because prior to that time, or during that time, what the Hopi asserted was not a question of where they lived, not actual use and occupancy. What the Hopi asserted was the language in the 1934 Act by including, you know, the Navajo and kind of such other Indians as located thereon was a grant of all of the land to the Hopi as joint tenants or tenants in common. That was the Hopi argument. That's why, when we say it was an intractable problem, it wasn't a problem as to use and occupancy. The issue or the encumbrance was what did that language mean in the 1934 Act? Because the Hopis interpreted it by, even though it wasn't a reference to the Hopis, the language of other Indians, the fact that the Hopis lived in a tiny little area gave the Hopis an unencumbered right to, I should say, an undivided half-interest joint-tenants right to the entire property. They also argued that for religious purposes they had rights that extended beyond the village and the grazing areas, right? They argued in addition to the joint tenancy that as a result of religious practices they had a right to the entire area, right? No, they didn't. That was created in litigation, you know, subsequent to Sakai. They argued that, right? They argued that well after 1982. That was after they lost the issue of what the language in the statute meant. And I will just address the religious issue for a moment, Your Honor. They made that argument that they were entitled to other lands for religious purposes. Ultimately, there was no evidence presented of that at all. And what happened when the party settled was that the Hopi got zero, not one foot, not one acre of land for religious purposes. There was no evidence of that. It was a nice, it was an argument. The Ninth Circuit kind of gave some creeps to it, said you have to have, if they can prove it, maybe there's something to it. There was never any evidence. Okay. I think we're kind of out of time here. We'll give you your three minutes of rebuttal back. May I speak to the court? I'm Mary Gay Sprague for the United States. Mr. Zeitland's view of the 1934 Act does not reflect Congress's view of the matter in 1934 or in 1974. The situation in 1934 is that the Hopis had been making claims to a large area of land beyond their villages. It's true that Hopis do live in villages, but they go out from the villages for grazing purposes, for gathering purposes, for religious purposes. And the studies that were done, there were studies that were done in the 30s, and various proposals about certain amount of land within the 1934 Act reservation to be set aside exclusively for the Hopi, and the remainder would be exclusively Navajo. And those studies did not carry the day. That's not what was enacted in the 1934 Act. Much of the land, because of the patterns of the time, you could have Navajo families grazing their sheep through an area of land at one season of the year, and you could have the Hopis having religious ceremonies, gathering wood, other materials at other times of the year. Both of these land uses were important to the people. One was not valued more than the other. As time went on, the conflict as the population grew, the conflict became apparent to Congress that something had to be done. Why did it take so long? I guess initially the tribes tried to resolve it by negotiation, and then in 1974 there was litigate. Why did it take 60 years to resolve this? It took 60 years because there were extremely different views about how to use the land. The Hopis were able to show, to persuade many people, that this was their traditional use of the land, but yet it wasn't felt from the Navajo point of view that you could exclude the Navajos. So you had two tribes with very strong claims based on their traditional patterns that had become mutually inconsistent. How many acres is the Bennett Freeze area? Roughly 2 million? 1.5 million acres, Your Honor. Okay, 1.5 million. At what point did it become apparent through resolution or otherwise that the Hopi claim was shrinking below 1.5 million to, say, 160,000, which is at one point where it got to? Your Honor, in 1992 was when the District of Arizona made its findings on the extent of Hopi use and very critical findings as to what kinds of uses would give rise to a property interest under the statute and then partitioned the joint use area. The District Court paid an award of about 61,000 acres to the Hopi tribe at that point and then released the Bennett Freeze for the balance of the 1.5 million acres. The Hopi asked for reconsideration and the District Court then reimposed the Bennett Freeze for the extent of what it had found was the joint use area of 160,000, maybe almost 200,000, about 190,000 acres as to which the Hopi had shown sufficiently intensive use to establish a property right, but then the District Court in partitioning had not ultimately awarded all of that land to the Hopi tribe. So as of 1992, there was about 190,000 acres that were still within the freeze, but then when the Ninth Circuit reviewed the case in 1995, they reversed the District Court finding that the Hopi religious use claim was insufficient to establish a property interest and it also expressly reversed the District Court on lifting the Bennett Freeze because the Ninth Circuit said that the 1980 amendments to the 1974 Settlement Act, which was the codification of the Bennett Freeze, defined the land in litigation as 1.5 million acres and the court said that the land is still in litigation until the Hopi exercise their right to petition the Supreme Court for certiorari and thereafter then a decision would be made as to what's remaining in litigation. What compensable property right did the Navajos hold after the 1934 Act to the area that would be defined as the BFA? They had a compensable right to occupy the property. They had a compensable right except to develop the land without regard to the Hopi interest and they were occupying and making beneficial use of the property. In 1966 the Commissioner of Indian Affairs decided that although it had been administered as if it were exclusively Navajo, in fact that was not the case and the Hopi rights had to be given an interest. What kind of development was at issue here that the Navajos say that they weren't able to engage in? You say they were able to do grazing, to move over the property, to live there. What is it that they couldn't do that they wanted to do? Construction, Your Honor. Construction of what? Construction of anything. Construction of commercial buildings, construction of residential buildings, construction of schools, construction of power lines, roads. Was it only new construction that was thwarted or what about repairs like fixing existing roofs and things? Your Honor, it was for much of the time the requests were only for new construction. After the 1980 amendments were imposed then those amendments were interpreted by the Hopi tribe and then by the United States as also extending to repair and replacement of existing structures but that restriction was eliminated in 1988 when Congress amended the 1980 amendments to clarify or to change the law to say that repair and replacement could go forward without Hopi consent. So there was a period from 1980 to 1988 when repair and replacement was part of the restriction. But just to finish your question, when the Ninth Circuit reversed on religious use the Hopi and the Navajo tribe thereafter agreed that the acreage that was subject to their claim other than religious use had been finally settled and that was about half the freeze so that land was no longer in litigation and that land was taken out of litigation and out of the freeze. So thereafter the freeze... Go back for a second. The 1934 Act, what is it again that you say it conveyed to the Navajos? It conveyed to the Navajo and to the Hopi the right to use the 1934 reservation as they had been using it. As from a practical perspective... So there was ambiguity but not uncertainty. And I say not uncertainty because if it's conveying everything you used there might be a dispute over what you used or not but you really are getting the right to everything you used. But it is not like the fence line dispute because it's not a question of finding what people were using. That's only the first step. Then a determination had to be made of how intensive a use would give rise to a property interest. But that's all just about how you define the line. That's not about whether or not there is a line. But in 1974 the 74 Act gave the court the right to partition and that actually did change the right because whereas before... I guess the question is what did they get in 1934, not what they got in 1974. The question is did they get in 1934 a present right subject to being defined later on or did they get a property interest that was not completely vested in all respects until there was a determination of which tribe was entitled to which areas. That's what we're struggling with. I think they did receive a vested right to jointly use the reservation. But it wasn't a question of just finding what that was because the 74 Act allowed for partition which was then a change in the rights that were vested in 1934. But let's go back again to what's vested in 1934. You say they did get a vested right... But not to exclusive control. Why not? The 1934 statute basically defines ownership in terms of what you've been located there on. Right. So why don't you have an exclusive right to everything you've been located on? Because the Hopi were also using the same property. Okay, but that's say 200,000 acres just at the broadest of the dispute that was... No, that was not the broadest of the dispute. The Hopi claim was much broader than that. It was ultimately... Certainly, that was their claim. But if the Navajo got everything they were located on and if it was discovered later that the Hopi were never within the sense of the language of the statute located on that property because they didn't meet the criteria that was later used to assess who was located where, then why didn't the Navajo have a compensable, unencumbered property right as of the 1934 Act? Your Honor, our position is that that was not enough, that Judge Brueggen was correct, that they got some compensable rights, they got some sticks in their bundle, but they didn't get the stick of exclusive control. But if there's any doubt about that, the 1980 statute solves the case because the 1980 statute either confirmed that the Navajo never had the right to exclusive control or the 1980 amendments which subjected the Navajo to the mutual consent requirement took away that right. Well, that's exactly why we're here, because the government took away a right they say they're entitled to. I don't think that you can use the fact that the government took it to say they never had it. If the government took away the right, then you've accepted the premise that they already had the right. No, our first position is that they did not have the right, but the second position is if they had it, then Congress took it away in 1980. Well, I think that makes him very happy. Well, the claim is time-barred, because they didn't file a claim until 1988, and it's a six-year statute of limitations, which is jurisdictional. And none of the arguments that they made in the Court of Federal Claims as to why their claim did not accrue in 1980 with the enactment of the 1980 amendments are persuasive. They had... Did any damages occur to the Navajo at the time of the 1980 enactment of the mutual consent requirement? Your Honor, the administrative freeze was put into effect in 1966, and our brief documents that from the outset the Navajo Nation was complaining bitterly to Congress, to the Department of the Interior, that their rights in their reservation were being seriously affected. And this began from the beginning. So by the time Congress enacted the 1980 amendments, the restrictions had already been in place for 14 years, in addition to which there was a similar mutual consent requirement that applied within the 1882 reservation, because at the same time the rights were being determined there, and the rights that were... The land that was awarded to the Hopi that was determined to be Hopi, there were Navajos that had to be relocated from that land, and there was a mutual consent requirement that there would be no development on that land pending the relocation. So that these... I mean, the Navajo original complaint talks about the effect of the freeze on thousands of Navajos going back to 1966, and the import of their complaint is a facial challenge to the 1980 amendments, and going back even farther than that to the 1966 administrative order of Commissioner Bennett. The claim accrues when all the events necessary to fix the liability of the defendant have occurred, and it's an objective standard, and it was clear on its face that the 1980 amendments applied the mutual consent requirement to 1.5 million acres of land. And this was clear from 1966 and crystal clear as of 1980. The possibility that some limited amount of development could proceed after that doesn't undercut the significance of the 1980 amendment. On the statute of limitations, we believe that the most applicable precedent are this Court's holdings in Caldwell and Barclay, which say that one looks to the acts of the government and... What about our wetland cases and our permitting cases that say until a permit's denied, there's been no harm? Your Honor, in this case, I believe that really the essence of the claim is a facial challenge, and that... Well, there was no permit sought from the government. That wasn't part of the process. It's true. Also, if you look to the as-applied cases, the application of the restriction was the choice in 1966 and then in 1980 to apply the restriction to these 1.5 million acres. The as-applied cases might make more sense if one were looking at a takings challenge brought by individual Navajo families who were injured by the freeze, but when you look to what is being asserted here, which is a challenge to the effect over a broad part of the Navajo reservation, that was implemented and applied in 1966 and then confirmed by Congress in 1980. All right. Well, I think you're out of time. Thank you very much, Ms. Frey. Mr. Zeitlin, you have three minutes. Thank you. Just a couple of comments. First, to the extent that the United States mentions the 1882 area, you know, that was a completely... That was an executive order area. It was completely different, and most importantly from this case, Your Honor, that area was determined to be a joint-use area. In other words, not like the 1934 area that we have exclusive use between two separate tribes. There, and I don't want to digress too far, but the 1880, because we go back to Healy Jones, but the 1882 area, that was set aside for the Hopi, or using the term Mokwe, Kama, and such other Indians, and the courts there held the Hopi get it all, and whatever other Indians were settled all became tenants in common or joint-use. Completely different here. So that's just a red herring, and simply not what I propose. The government certainly admits, and there's really no question, that the Navajo got vested rights in 1934 to the land. The Hopi also... Some sort of rights. Some sort of rights. Some rights, but not the right to exclude other people is their position. So why is that wrong? They have the right to exclude other... Well, when we say exclude, they certainly have the right to use, and occupy, and we would have certainly developed land that was exclusively theirs. That was exclusive. In other words, land that the Hopis did not own. Right away, before there was a resolution of who owned what? As of 1934, Your Honor, and that was... When we talk about when it was resolved, Your Honor, this is... In 1980, the Ninth Circuit determined that the Hopi were limited to actual use and occupancy. From that point on, there was simply no, let's say, legitimate issue of Hopi use and occupancy. Now, I do want to address one thing in terms of what happened in 1982. Your Honor, that's the Hopi moratorium, and the Navajo could do nothing with their land. You're talking literally over 1,200,000 acres. We could do zero. I mean, we could live there, but if you had a house, you couldn't improve it. But why didn't the 1980 Mutual Consent Enactment start the statute of limitations running for you? Because, for a couple of reasons. That's when the government effectively took away a property right that you say you had. You say you had an unencumbered right in 34 to the area you were located on. And in 1980, the government made it clear you no longer had an unencumbered right. You have to seek someone else's consent before you can do anything on it. Right, right. And let me just say this, Your Honor. I think the answer is the history preferatory. And this is what the government points to as well. We kind of point to it for different purposes. In 1966, Commissioner Bennett poses what we now call the Bennett Freeze, which creates the 1.5 million acres and says, we're going to have to impose basically the Hopi Consent Requirement. What happens, though, post-1966, and the United States is right again, the Navajos complained bitterly because it was incredibly onerous. And, of course, what happened is that the Commissioner rescinded much of what he said. And there was at least four separate decisions. But in 1980, it went back into effect. And that would put you outside the statute of limitations period. So why doesn't that trigger the statute of limitations when it took away your unencumbered rights? Okay. Because in 1980, Your Honor, what happened was what people believed, first of all, what had two things happen. First of all, when the Hopi Consent Requirement was imposed, projects continued to get improved, which is what I was going to get at, because after these four changes with Commissioner Bennett, from basically from 1976 through 1982, almost every project, I think, except one, were approved. You tell me, wait, what's the taking? Them making you ask for consent before building or them denying you permission to build? The taking occurred twofold. It occurred in 1982 because, number one, we had to go to the Hopi Consent. Now, in 1980, the Hopi, and what actually happened, the Hopi did consent to a couple of things. And what we thought... Did the government take away a property right in 1980 when it made you seek consent? No. The right was taken. The right was taken as applied. It's not as a facial attack. Because the Hopi, as what happened when the Commissioner had oversight, projects got approved. The Nava had no experience prior from, certainly from 1976 to 1982, the last six years, or certainly the four years before the statute, there was no experience that their projects wouldn't get approved. It was just the opposite. Projects got approved. And what happened... All projects got approved? All but one. All but one. I think there was 12 or 13 were approved, Your Honor. Between 19... And that actually went through 1982. Between 1976 and 1982, I think there were 13 or 15, I can't remember. And it was either 12 or 14 of the projects were approved. Okay. I think we're out of time. Thank you very much, Mr. Simon. Thank you, both counsel and the cases.